Good morning, Your Honor. It seems to be securities fraud day at the Ninth Circuit. My name is Susan Alexander, on behalf of the plaintiff class of investors, and I'd like to reserve five minutes for rebuttal. Plaintiff's complaint pleads a plausible theory of loss causation, satisfying the Supreme Court's decision in Bell Atlantic v. Twombly, and alleges the factual linkage between the misrepresentation and the loss, more than satisfying the Supreme Court's decision in Dura and this Court's decision in Dow. Actually, I'd like to go through the theory of loss causation, and I have a summary of the complaint allegations, which I wasn't sure if it would be helpful or not. But in light of the argument this morning, it seems that it would be helpful. I have copies for defense counsel in the court. May I give them to the clerk? Pass them up? Or do you want me to just hand them to the clerk and have opposing counsel seen this? I'm going to give it to opposing counsel. This is straight out of the complaint. So, yes, opposing counsel has seen all of these allegations. It's simply a summary. You gave him only one to share? Oh, there we go. The loss causation theory is ---- Mr. Svetkov looks like he wants a copy, too. No, he's okay. Mr. Svetkov became a grandfather at 1230 this morning. Oh, congratulations, Mr. Svetkov. Mazel tov. Mazel tov. The loss causation theory is straightforward. In the second quarter of 2003, Gilead announced strong results based primarily on their drug Viriad, and they said based primarily on increased prescriptions of Viriad. The stock price went up by 13%. In fact, those numbers were artificially inflated by illegal off-label marketing, which means that they were ---- Gilead was marketing Viriad for illnesses for which it had not been approved by the FDA and against the safety profile that the FDA had prescribed. But those were real sales. They were real sales based on illegal marketing. Why is that a securities fraud? Because what Gilead was doing was misrepresenting the true demand for the FDA-approved uses of Viriad. And as Judge Jenkins explained, if they engage in off-label marketing techniques to the degree that's alleged, it was foreseeable at some point that this house built on quicksand would fall and the numbers would be what they assert. And that's exactly what happened. But a lot of drugs are used off-label, and the pharmaceuticals don't report that our sales are 90% approved and 10% the doctors use because it's beyond the prescription that was approved for. What was happening here was not just not that doctors were using the drugs for some other purpose. What was happening here was that Gilead representatives and the defendants themselves were off-label marketing the drugs, so they were ---- they knew that they were selling it for purposes for which it hadn't been approved against, and they knew that it was illegal, which meant ---- My problem is pharmaceutical companies know that drugs are sold, are bought sometimes for off-label, but they didn't misrepresent the extent of the sales. The sales they represented were accurate sales. The sales they represented are accurate sales that were achieved illegally, and what they knew was that when they got caught, that demand would ---- the inflation for the off-label ---- What you're saying is it was illegal for them to sell the drug when they knew the doctors were buying it for off-label purposes. I have a little problem swallowing that. What I'm saying is a little bit different than that, I believe, Your Honor. What I'm saying is that the demand that they were representing to the market was not the true demand for the FDA-approved purposes of Veriad. So they were saying, this is the demand for our drug. And, in fact, this was the demand for their drug if they engaged in illegal marketing and didn't get caught. I understand. What happened is they got caught. I'm sorry. I mean, if it's a real demand, and these are real sales, let's say somebody discovers that you can use aspirin. Well, aspirin is not a prescription drug, but let's say some prescription analgesic, and if you mix it with water and put it in your scalp, it grows back hair. It's a spectacle. Many people get excited. And people use it this way. Why is that? And, you know, why is it as legitimate a sale as anything else? I mean, it may be illegal to market it that way. It may be. But that's a problem between them and the FDA, and they may get into trouble for doing that. But if people keep buying it to grow hair, it's as good a sale as anything else, isn't it? That's the problem, is when the FDA, when the illegal marketing was disclosed, people didn't keep buying it. But how would they know that? How would they know that when that's disclosed, people wouldn't keep? What they knew, as Judge Jenkins explained, was if they engaged in illegal marketing to sell their product, if the demand that they were presenting to the market was based on what they could do with legal marketing and illegal marketing, it was absolutely foreseeable that when the illegal marketing was disclosed, when doctors found out the drug hasn't been approved for those purposes, the drug does have, you know, causes kidney failure and can't actually be used by patients who are co-infected with hepatitis B and AIDS for a lot of reasons. When doctors find that out, doctors stop buying the drug, and that's what happened, and that was absolutely foreseeable. So the demand that was presented to the market was not the true financial condition of Gilead when they market Viriad legally. That's what was misrepresented to the market, and that's why it becomes a securities fraud issue. What have you pled to indicate that the upper corporate management knew that the drug was being sold by its sales force for illness, was being pushed for off-label consumption? Have you pled anything to that? We've pled substantial facts regarding the CNTR. In fact, the district court even concluded that we had pled, we had adequately alleged sufficient facts to show a strong inference that defendants had knowledge of the scheme. Like what? That upper corporate knew that the sales force was hyping it for off-label? So each defendant, other than defendant Caracciola, was identified as being at the meetings where data, off-label marketing data was given to the sales people. They were given slides, posters and presentation material, so the defendants were present when that happened. Here's something interesting that I found. When the two FDA letters were issued, there was a private letter to Gilead in March of 2002, saying you've been off-label marketing and you need to cease and desist off-label marketing of Viriad. According to the witnesses, the statements that were the subject of those letters were made by the CEO of the company. These are not statements being made by low-level employees. This was the statement by the CEO. And then when the formal letter was issued in July of 2003, and they issued an official warning saying we've now, you know, you didn't cease and desist and we've now seen a representative at an AIDS conference in Miami in front of 1,500 AIDS patients and social workers and health care providers making absolutely illegal representations about this drug against its safety profile. It turns out, our witnesses say, the individual who made those statements was a guy named Tino Quintero. Defendants' response to Tino Quintero making those statements in front of 1,500 people at that conference was to promote him to the President's Club for high sales. Is it your position that if there's a prescription drug approved by the FDA to say for one bodily infirmity or whatever, is it improper for a sales force to tell a doctor, look, because the doctors know, this is approved for ailment A. It's not approved for ailment B. But a lot of doctors use it for B off-label. Is that illegal? My understanding is that it is illegal to, that if a doctor initiates a conversation, the sales representative can respond, but that it is illegal for a sales representative to initiate a conversation. I think the question was simply from the doctor's point of view, is there anything wrong with the doctor prescribing off-label? No. Well, to go one step further, then if it's not illegal for the doctor prescribed off-label, and it certainly is not, would it be, is it illegal for the pharmacy, a pharmaceutical company to say, to suggest that it's illegal to prescribe off-label? No. It's not illegal for the pharmacy to suggest to a doctor, look, this is approved for A. But we understand a lot of doctors use it for B. It's your call as to whether or not you want to use it for bodily infirmity B, which it's not approved for. It's only approved for A. Is that illegal? I think that it might be, and it's not the case here. That's not what the allegations are here. Here what's alleged is that they didn't say, by the way, the safety profile that was approved by the FDA says that if you prescribe this drug to somebody who's co-infected with AIDS and hepatitis, he may have serious health problems. He may have serious side effects, but some people do it, and so that's okay. You can go ahead and try it if you want. That's not what was said. The safety profile wasn't discussed. Instead, what was said was this has the same safety side effects as a placebo. It has no problems. This is a great drug. Well, that's it. The doctors know what it's FDA approved for. The doctors, look, you're dealing with an expert here. The doctor knows it's approved for A. And they've got a detailed man or woman who's saying, look, this is approved for B. It's approved for A, but it's damn good for B. Then they're not forcing the doctor to write prescriptions for B. They're just telling him it's a lot of your colleagues use it for B. It's your call, doc. So stepping back for a minute, the question here is whether or not loss causation was pled at the pleading stage. We're subject to a notice pleading requirement. We've articulated a clear and plausible theory. It's supported by factual linkage between the misrepresentation and the loss. In fact, the exhibit, the Morgan Stanley report submitted by defendants shows that prescription rates did fall. So when doctors found out about the complete FDA information, they did reduce their prescriptions. But that's well beyond what we needed to plead at this stage.  What makes me very queasy about your theory, not words you want to hear, but nevertheless. Okay. It seems to me that anything that a company does that could be charged as an illegality gets converted to a securities claim. Let's say, for example, a company has sales overseas. And in conducting those sales, they, how does one put it delicately, they... Sensitive foreign payments. I think that's what they're called. That's what they're called. They make sensitive foreign payments. Thank you. That's exactly the expression I was looking for. That arguably violate the Foreign Corrupt Practices Act. And, you know, these payments are made. They generate sales. And it turns out that later on, when disclosed, there's some repercussions. Does the company then have to disclose it to the market and say, you know, we have all these sales abroad, but incidentally we make these payments that arguably violate the Foreign Corrupt Practices Act. Or, to do it the other way, to sort of consider, they use workers, or they buy products that are made by workers in other countries. And some of those may be young or, you know, the kind of claims that could be brought. And there's a big tort lawsuit in the United States years later saying we, the company, exploits workers. Does the company then have to say, well, we buy a product from a country that doesn't have American safety standards or child labor laws. And therefore we may very well have exposure for hundreds or thousands of workers who might be injured in producing this product. And I could go down a very long list of things that companies do that eventually may get them into difficulty, at least may get them into a lawsuit, which would erode confidence in the company and erode the price. And if your theory is accepted in this case, I don't see how it can't apply to everything else. And pretty much the 10-K report and the annual report would have to become a laundry list of all the things that companies do. Basically a, here, come get me, plaintiffs' lawyers, because these are all the things we're doing that we think might expose us to liability. I mean, I don't know how you get out of that particular, I don't know. I'm not sure that it's too high a burden to expect corporations to comply with federal regulations. So to the extent that... You agree with me, then, that basically what they have to do is they have to go through anything and everything that they think somebody might have a lawsuit over and say, here are the things we do that we think are okay, but probably are questionable, and if only our enemies knew about this or plaintiffs' bar knew about these things, we could probably get sued pretty good. No, that's not what I'm saying. Okay. Tell me why. Because there's no way to look at this off-label marketing. There's no way that defendants could honestly have said, we think these things are okay, but somebody could have an issue with them. That's not the case. This isn't a close question like that. Because they were off-label marketing against the FDA approval. All they got was a letter saying, hey, cut it out. They didn't get sanctioned. They didn't get their approval pulled. They didn't get hauled into district court on criminal charges. The SEC didn't go after them. I mean, nothing really bad happened. They got a letter. Cut it out. And they didn't. Well, if they're illegally marketing the demand, they're not representing the true financial condition of the company, because they're not representing the demand for the company if they legally market for the purposes for which it's been approved. So how do you limit this? Anything the company does that might be subject to legal troubles in the future has to be disclosed? If a company is illegally marketing their product, yes. And it's material. And it's material. And if it's to the extent of 75 to 95 percent of their sales. How about those sensitive foreign payments? If the sensitive foreign payments were accounting for 75 to 95 percent of the company's sales, and they're not only sensitive, but actually illegal, then, yes, they would need to be disclosed. Yeah, but in this case, what bothers me is they got a cease and desist order, in effect, from the FDA. Correct. They didn't contest that. They didn't go into an administrative proceeding and say, we contest this cease and desist order. We are not doing anything improper under federal law. All we're doing is saying to the doctors, doctors, this is approved for A. But, by the way, a lot of doctors use it for B. And we're not forcing you to write prescriptions for it. We're just informing you that a lot of doctors use it for B. And I want to tell you something. There's a lot of medical journals which do just that to doctors. They say this is approved for this, but it's good for people that have coronary problems. The medical journals do that all the time. Isn't that exactly what the FDA told them to stop doing? I'm sorry, I'm not sure what the that is. The that is telling doctors it's okay to prescribe it, that other doctors are prescribing it for off-label purposes. Well, the FDA was speaking to the sales representatives at Gilead saying that it can't be marketed to the doctors. The FDA doesn't regulate, I gather. What's that? My point is that if they would have gone to bat on this and said, look, we're doing nothing wrong, the fact that they ceased does not mean they're wrong. It just means they compromised, they settled the case without going to court. They didn't just cease. In response to the first private letter they wrote a letter. They didn't go to the mat on this and say we're doing nothing wrong. All we're doing is saying to the doctor it's approved for A, but by the way, a lot of doctors use it for B. It's your choice as to whether or not you want to use it off-label. In fact, in response to the first letter, they responded to the FDA and said that they would stop off-label marketing. They just didn't. Well, they're bad boys, no question about it. But the hard question is, is it a violation of the Reform Act when they did not disclose that a lot of their sales are a result of their sales and 95%? Well, that's the question posed for adjudication. But the question is, why is it illegal for a detailed person to go into a doctor and say it's approved for A, but it's your choice if you want to use it for B? What's illegal about that, for a detailed person to tell a doctor that? A detailed person? These are guys that go around. Sales persons. Sales persons at doctors' offices, they give them free samples and they say it's approved for coronaries, but you can use it also for cancer or whatever. I don't know if that would be against FDA regulations. It seems to me that it would, but it's, again, not the case here. That's not what they said. Instead, they said it could be used as a first-line remedy when it had not been approved for that purpose. They didn't say it hasn't been approved, but you might want to try it. They said Viriad can be used as a first-line remedy. They said that Viriad could be used for patients who were co-infected with AIDS and hepatitis B when it has never been approved for that purpose, but that's not the complete information. They were being told, look, the FDA has approved this drug, and you should use it for your patients who have AIDS and hepatitis B. In fact, it has serious consequences for people with AIDS and hepatitis B and can be extremely life-threatening to those patients. And when the FDA report was made public, doctors reduced their prescriptions, which shows that they didn't have all of that information, because they responded to that information by prescribing the drug less. Thank you. May it please the Court, good morning. I'm John Dwyer on behalf of Gilead Sciences and the individual defendants. I want to talk about some of the off-label issues in a moment, but before I go to that, I want to highlight what I think is sort of a fundamental flaw in the theory that they are pursuing in this complaint that they've brought against Gilead. Their core theory, as counsel just reiterated in their complaint, is that because of conduct, alleged conduct by the individual defendants involving off-label marketing, the company gave a false sense of the demand for Varia. That's their basic theory. And they point to a whole bunch of different things trying to prove that. When did the officers of your company, at what point in time did they understand that when they received a formal letter from the FDA about off-label marketing, that they had to stop marketing it in that way? Well, in fact, Your Honor, when you look at the letter that they received, it says nothing about the off-label marketing that is the primary off-label marketing that is alleged in the complaint. That is, the complaint focuses on activities involving primarily two categories. One, to patients who were co-infected with HIV and hepatitis B, and also patients who were considered treatment-naive. That is, they had not used any other drug regimen previously. The allegations in the complaint is that the company was actively marketing to those individuals. We deny those, but we understand they're alleged. It was actively marketing to those individuals. The letter, which is attached to the complaint, mentions nothing about hepatitis B or co-infected patients. It mentions nothing about treatment-naive patients. What it mentions is, and by the way, it was not a speech to 1,500 people. It was a, as I read the letter, it was a statement that was made by somebody standing at the booth, the Gilead booth, at a conference that was attended by 1,500 people. And if you read the letter, what it says... My kids would describe that as busted. Well, but it's important to understand what they were, quote, busted for, because it had nothing to do with this massive off-label marketing that is alleged by the complaint. What they were busted for, to use your terminology, was that there was a statement made in which the presenter did not mention that Varia had needed to be used in combination with other antiretroviral drugs for the treatment of HIV. That's one thing. There was also a statement made with regard to the impact on lipids, which as I understand is cholesterol levels. That was the other thing, and there was a general statement about the safety protocol. None of that has to do with the alleged off-label marketing in the complaint with regard to co-infected patients, co-infected hepatitis B patients, or treatment-naive patients, which they claim constituted 75 to 95% of Varia's total sales. When your clients received the formal letter from the FDA, did they understand that they couldn't market in the way that the FDA approved of, disapproved of? Without regard to specifics, they got a letter, the FDA said you're marketing this incorrectly, stop. Yes, they understood that. And they understood at that point in time that they had to stop doing that, whatever it was. That's right, but it's very discreet what the letter addressed. And at that point in time, what percentage of the sales of this product were being marketed on off-label basis? Well, so the complaint alleges 75%, right? That's what the complaint alleges. The point I was going to make, Your Honor. I'm not done with my questions, just one second. What do we make of the fact that two days before the letter was disclosed, two executives of your company sold almost $7 million worth of their stock? I think that, I apologize, I think the number is $3 million, but the point is. Well, Mark Perry sold 52,000 shares for 3.376 million. Norbert Bischoffberger, I hope I'm pronouncing that right, Executive Price President, sold 55,000 shares for a total value of $3.4 million. Are those roughly right? I think those are the allegations. And you concede these are company insiders? Those are company insiders. Who understood the impact of the FBA letter when the company received it? I have no reason to believe that those individuals had seen the letter at that time. And I don't think it's alleged that they actually saw the letter at that time. What Judge Jenkins found was that if you looked at the trading of those individuals as well as the other defendants, that it was not, under Silicon Graphics, suspicious given the timing. That is, if you looked at the group and the individuals, they each sold roughly the same amount of shares during the class period as they did in the quarter immediately before the class period. All of that is set forth in the record. So you think it's of no moment that the Executive Vice President for Operations and the Executive Vice President for Research and Development sold almost $7 million worth of shares at a time when they knew what the FDA had told the company not to do, but the investing public did not? Again, we don't know that they had access to that information. But as Judge Jenkins found, if you look at those two individual sales, they also sold substantially more shares later in that period after the FDA letter was disclosed. And Judge Jenkins says that doesn't make sense. If you were concerned about the impact this letter would have on your stock price, you would have sold it all right away. I guess there are two ways of looking at that. One way of looking at that is that they sold some before the investing public knew, and then when the information became public and it didn't have an immediate impact, they said, aha, let's get rid of the rest of our shares. And, of course, there was no immediate impact on February 7th and the drop. Conceitedly, there was some time lag. The allegation is that the reason there was not an immediate impact is that the company failed to disclose how dependent the company was on the off-label sales. So no effect, because people just sort of said, well, this must not be very significant, because these are off-label sales. Had they disclosed that this was 75 to 95 percent or whatever of the actual sales, it would have had a bigger impact. So it's not that it took time. It was that the company failed to disclose relevant information that would have allowed the market to But the problem with that theory is that they try to link the letter to the stock drop that occurs on October 29th, and there's nothing on October 29th that relates to the FDA letter, allegations of off-label marketing, or anything else, nothing to suggest that the risk materialized on that date. And let me talk about, again, going back to the core theory, which is the demand was overstated for Variad. At the beginning of the class period, here's what the company said about the demand for Variad. The company said that they expected Variad revenues for calendar year 2003. So we're halfway through calendar year 2003. They said, we expect sales for Variad to be between $550 and $600 million in the calendar year. As far as the third quarter goes, we expect sales to be at or below second quarter levels. In fact, what happened, third quarter revenues were below second quarter levels, but according to the 10-K that the court took judicial notice of, sales for the year of Variad for 2003 were $566 million. That is, the total sales for Variad in 2003 were directly within the range that the company had provided to the public markets at the beginning of the class period. To build an entire theory, which I think is unbelievably attenuated, and I want to walk through that theory, but to build an entire theory that somehow the company presented a demand for Variad that was unrealistic, that was exaggerated, when we know, and when the court took judicial notice of the fact, that in fact the company's projections about the demand for the drug in 2003 were spot on. I think that in and of itself tremendously undercuts their theory. Well, moving from the connection of the price of stock drop from the effect of the FDA letter, going to their basic theory that what you did was a misrepresentation, in effect. Their basic theory is that, look, you didn't tell the public, the investing public, that you were, through your workforce, hyping off-label use. They didn't know that. They thought that these sales were FDA-approved sales, and according to the plaintiff, they were unaware that over 75% of your sales were sales which were illegal, they claim, because you were pushing them for illegal purposes. Why wouldn't the investing public, an investor, be interested in knowing that a pharmaceutical house was having its sales force sell pharmaceuticals for illegal purposes, because suddenly they would say, gee, if they ever get caught, this stock is going to drop eventually. Why wouldn't an investor be interested in that? I actually think it's more likely that an investor really would not care about that, for some of the reasons that you identified earlier, which is, in fact, there's a tremendous amount of off-label prescriptions that go on. Yeah, but over 75% of a pharmaceutical house's sales, there's a lot of that off-label, but not 75% of any of the big pharmaceutical houses, nothing approaching that. Well, in some of our earlier briefs, Your Honor, we actually cited two studies that were done that actually said that roughly 50% of all prescriptions in the United States are done off-label. So the numbers are actually quite remarkable. And I believe in this case, where the allegations, and again, we're assuming the allegations is true, and the court on off-label marketing simply said it's a fact question, so I'm not going to decide that now. Where you're talking about marketing to treatment-naive patients and patients co-infected with hepatitis B, I'm not sure the market would really care. There's nothing in the allegations, at least that I recall, where it turned out that anybody said that treating co-infected patients was a dangerous thing. Is it your position that if I have $10,000 and I want to invest it in the market, that I wouldn't, and I'm thinking of going into this company, that I wouldn't want to know that this company's 75% of its sales are illegal sales, and if they get caught, that means my investment is going to be subject to a company whose sales are going to be cut dramatically? Right. I mean, yes, you would want to know. You would want to know that. That's a material fact, isn't it? Especially because if, in fact, that's happening, you would expect that the regulatory agencies would take dramatic and draconian actions with the companies and with the individuals that were involved. That's not the fact case we have here. We've come to expect less of the FDA these days. When you say that's not the fact here, the stock did go down eventually. The stock went down almost three months later, and there's nothing on the there's certain facts that are undisputed. We know the stock didn't go down when the FDA letter was disclosed. We know on October 28th, or the following day the stock went down, we know on the 28th there was no mention in the company's disclosures with regard to FDA, off-label marketing, or any of the other conduct which is alleged to be improper in this complaint. What we know is that the company announced that it had made a mistake when they reported their second quarter revenue numbers. When they reported their second quarter revenue numbers, they said, hey, we sell, as you know, we sell 90% of our drugs to three wholesalers, basically. And they then sell it to drugstores and doctors and fill prescriptions, basically. We know that during the previous quarter the wholesalers were building up their inventory. We believe they built up their inventory by $25 to $30 million. But we're not sure. There's all sorts of forward language about it's a guesstimate, it's imperfect information. The only new information on October 28th that was inconsistent with anything earlier was the fact the company said, based upon further analysis and review, we believe back in the second quarter the inventory build was not $25 to $30 million, but was $33 to $37 million by the wholesaler. The result of that means is that the true demand in the second quarter, not in the third quarter after the FDA letter came out, but the true demand in the second quarter was less than the public had previously believed, true demand being the number of people who were actually using the drug who were being prescribed the drug. Before I run out of time, I want to talk briefly about the standard, and I think it's important for the Court to understand how attenuated their theory is. Under any standard, whether or not it's Rule 9 or Rule 8, under the most forgiving of those standards, which I believe is Rule 8 under the Twombly decision, the plaintiffs need to come up with a theory that is plausible. And Twombly made clear that plausible does not mean possible. It's above speculative. What Twombly says is you need to move it from the conceivable to the plausible, plausible meaning worthy of belief. Their theory actually takes seven or eight steps. It is so attenuated that I was unable to find any recorded case that had a causation theory that was nearly this attenuated. Well, causation is subject to Rule 8, not to Rule 9, I believe. And that's they've alleged that the stock went down because of your misrepresentation. Well, Rule 8, as interpreted under Bellman v. Twombly, which is not simply that you can articulate a theory, not simply that you can say here's a possible theory. You need to come up with something that is plausible. That's what the Supreme Court said in Bellman. Did they articulate a theory? Well, so their theory, if I can, very briefly, was that Gilead engaged in massive off-label marketing, that by failing to disclose that, they created a false sense of the demand for the drug, that that off-label marketing resulted in the FDA letter, even though the FDA letter says nothing about co-infected patients or treatment IEV, that once the letter became public, physicians were less eager to prescribe the drug to their patients, although they don't identify whether or not that was one doctor or several doctors. They make no effort to quantify that, that that would have an impact on demand. They're under Rule 8. Go on. That there was a sharp drop in prescriptions, that wholesalers somehow were able to pick this up, and they decreased their inventory build, and this is the linchpin, that as a result prescriptions in Q3 decreased. And so there's about eight steps there. The final step clearly contradicted by the only information that was in the marketplace. The only information in the marketplace about prescription levels in Q3 were the company's public disclosure that said the prescriptions were up in Q3 as compared to Q2 of 2003. That's what the company said. And then there were the two analyst reports that were cited by plaintiffs, by Bear Stearns and by Morgan Stanley, both of which said prescriptions were up in Q3 over Q2 by either somewhere between 14% and 17% were where those two analyst reports were. So after going through five or six steps, their final step, which is based upon prescriptions being less than previously, the prescriptions were going down is inconsistent and, in fact, contradicted by judicially noticeable facts. Thank you. Thank you. I'll be very brief. I just want to point to two portions of the excerpts of record. At page 109, it's excerpts of record 109 is the last page of the FDA warning letter. Again, defendants throughout their briefs and in court continue to minimize what happened and the extent of the FDA's concern. The FDA said this was a significant public and health, public health and safety concern raised by repeated promotional activities. The other page of the excerpts of record that I would. Is that the point in time you think they needed to disclose? No, absolutely not. They knew. What was the point in time at which they failed to disclose this actionable new view? As soon as they knew that their sales were dependent on 70, that 75 to 95 percent of their sales were dependent on off-label marketing, which happened, if you look at paragraphs 141 through 165 of the complaint, there is a series of meetings around the country where sales representatives were given data and pamphlets and brochures with which to market this drug for purposes beyond which the FDA had. This predated the FDA's letter. I'm sorry? This predated the FDA's letter. Correct. By how long? The complaint alleges that the off-label marketing began in September of 2001. They claim there was no causality here in the drop of prescriptions by reason of the revelation. They did. So the second thing that I wanted to refer to in the excerpts of record, because they've made this argument before, it's incorrect, is excerpts of record page 118. So first of all, Your Honor was exactly right in stating that this is, loss causation is subject to notice pleading. So we've alleged a plausible theory that prescription rates went down, and in response to that reduced demand, wholesalers drew their inventory down to a two-week level rather than replenishing, buying more Veriad to maintain the 5.8-week level of inventory, which is standard in the industry. And the combination of reduced doctor prescriptions and then reduced inventory, wholesalers purchasing in response to that is what caused the reduced demand. And that would be enough to state a theory. But defendants submitted the Morgan Stanley Report, and in fact, it supports our theory. If you look at ER 118. It's got an effect on the stock price. Excuse me? It's got an effect upon the stock price. The reduced demand is what was revealed when the third quarter earnings were revealed, and that's what investors pay attention to is the earnings, and that's when they responded as soon as they heard it. And if you look at ER 118, it shows exactly what we said, that in August there was an immediate spike down, an immediate drop in prescription rates, and then it slowly recovered. And the complaint even explains that the slow recovery, the complaint alleges the recovery is less than what it would have been if the FDA letter hadn't been revealed, and even explains that the later recovery has to do with the fact that eventually, later in the quarter, the FDA did give partial approval to, an additional partial approval for Veriad. So it was combined good and bad news that affected the prescription rates. But the complaint alleges that overall the third quarter prescription rates were if the doctors hadn't gotten that information about the FDA letter. It disclosed the true financial condition of Gilead. Thank you, Your Honors. Thank you. The case is argued and will stand submitted. I think that was the last case on the calendar, so we are adjourned. Thank you.
judges: Kozinski, Hawkins, Cowen